FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA 2013 MAY -3 P 3: 51

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| DAVID C. INLOES, | ) | |
| Derivatively on Behalf of Nominal | ) | |
| Defendant STAR SCIENTIFIC, INC., | ) | No. $1:13 cv 557$ |
| | ) | $AJT/TRJ$ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JONNIE R. WILLIAMS, PAUL L. | ) | |
| PERITO, CHRISTOPHER CHAPMAN, | ) | |
| NEIL L. CHAYET, RALPH B. EVERETT, | ) | |
| and BURTON J. HAYNES, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | **SHAREHOLDER DERIVATIVE** |
| and | ) | **COMPLAINT** |
| | ) | |
| STAR SCIENTIFIC, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Nominal Defendant. | ) | |

## SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

Plaintiff, David C. Inloes ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint (the "Complaint") for the benefit of nominal defendant, Star Scientific, Inc. ("Star Scientific" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

1.   Star Scientific develops and markets health technologies and dietary supplements.

The Company has operated at a loss for the last ten years. What revenues it does have are sales of a supplement called Anatabloc, which is purported to reduce inflammation. The Company claims Anatabloc is applicable to a wide variety of ills and has been conducting numerous clinical trials on both mice and humans in an effort to demonstrate the efficacy of the product when applied to various serious illnesses such as Multiple Sclerosis, Alzheimers, and others.

2.      As a supplement, Anatabloc is not approved by the U.S. Food and Drug Administration. In an apparent effort to provide credibility to its claims about Anatabloc, at some time in the beginning of 2012, the Company began stating the prestigious research university and medical school, Johns Hopkins University, was involved in the clinical testing of Anatabloc and its active ingredient. The connection with Johns Hopkins was both mentioned in Company filings with the Securities and Exchange Commission ("SEC"), and fed to analysts and financial bloggers in private meetings.

3.      In January 2013, an article on *TheStreet.com* revealed the purported connection to Johns Hopkins to be a falsehood and quoted a University spokesperson as stating that it had no involvement in any trials related to Anatabloc. The Company immediately refuted the story and failed to acknowledge Johns Hopkins' complete lack of involvement.

4.      The Board of Star Scientific has long been dominated by one man, Jonnie R. Williams ("Williams"), the Company's highly paid Chief Executive Officer ("CEO"). For many years, the Board has approved a wide variety of related party transactions involving Williams. Many of these transactions included the transfer of Company equities. Additionally, a Williams-controlled entity rents the Company a private jet, and an entity part-owned by Williams is entitled to a percentage of the Company's revenue as a royalty payment if Star Scientific ever becomes profitable. Williams has a past that is relevant to the allegations herein: in 1994, a

judgment was entered against him in an action brought by the SEC related to a pump-and-dump scheme.

5.      Unbeknownst to the Company's shareholders, during the end of January 2013, while the Company was attempting to defend its misstatements regarding Johns Hopkins, Star Scientific received a subpoena from the United States Attorney's Office for the Eastern District of Virginia (the "DOJ"). The DOJ was investigating transactions involving the Company's securities including certain private placements and related party transactions since 2006.

6.      The Company delayed in disclosing the receipt of the subpoena for nearly two months. Finally, on March 18, 2013, the Company admitted that it was under investigation by the DOJ when it filed its Form 10-K with the SEC for the year ended December 31, 2012.

7.      Star Scientific's situation is not a simple accounting error or some other one-time slip-up but a pervasive failure of corporate governance extending from inadequate controls to ensure truthful and timely disclosure to improper approval of related party transactions, and possibly including insider trading. There are currently six directors on Star Scientific's board, five of whom are directly implicated in the wrongdoing not only by failing to adequately supervise the Company, but also by actively approving wrongful conduct and even participating in it. Plaintiff has not made a demand on the Board because, as detailed herein, the Star Scientific Board is not disinterested and independent.

8.      The defendants are all current directors and officers who have permitted Star Scientific to function without sufficient controls and breached their fiduciary duties thereby. The Company has now been gravely harmed.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that

this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10.      Venue is proper in this Court because Star Scientific maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Director Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### A. Plaintiff

11.      Plaintiff David C. Inloes is a resident of Bucks County, Pennsylvania. Plaintiff is, and was at all times relevant hereto, an owner and holder of Star Scientific common stock.

### B. Defendants

12.      Nominal defendant Star Scientific is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 4470 Cox Road, Glen Allen, Virginia. According to its public filings, Star Scientific engages in the development, manufacture, sale, and marketing of dietary supplements and consumer products with an emphasis on healthy metabolism and lifestyle. The Company offers non-nicotine nutraceutical and dietary supplements, including Antabloc for anti-inflammatory support, and CigRx for fighting the urge to smoke cigarettes.

13.      Jonnie R. Williams has served as a director since 1998 and has served as Star Scientific's CEO since 1999. Williams is a major stockholder of the Company, owning over 12% of the Company as of October 29, 2012.

14. Paul L. Perito ("Perito") has served as a director since 1999 and is the Chairman of the Board, President, and Chief Operating Officer.

15. Burton J. Haynes ("Haynes") has served as a director since 2010. Haynes is the Chair of the Audit Committee, and is a member of the Compensation Committee.

16. Christopher C. Chapman ("Chapman") has served as a director since 2005. Chapman is the Chair of the Compensation Committee, and a member of the Audit Committee and the Nominating Committee.

17. Neil L. Chayet ("Chayet") has served as a director of Star Scientific since 2007. Chayet is a member of the Compensation Committee.

18. Ralph B. Everett ("Everett") was recently appointed to the Board in 2012. The Company has not publicly disclosed whether Everett serves on any Committees of the Board.

19. The defendants referenced in ¶¶ 13-18 shall be collectively referred to herein as the "Director Defendants."

## DEFENDANTS' DUTIES

20. By reason of their positions as officers, directors, and/or fiduciaries of Star Scientific and because of their ability to control the business and corporate affairs of Star Scientific, Defendants owed Star Scientific and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Star Scientific in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Star Scientific and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Star Scientific and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and

in the use and preservation of its property and assets, and the highest obligations of fair dealing.

21.     Defendants, because of their positions of control and authority as directors and/or officers of Star Scientific, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial, and directorial positions with Star Scientific, each of the Defendants had knowledge of material non-public information regarding the Company.

22.     To discharge their duties, the officers and directors of Star Scientific were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of Star Scientific were required to, among other things:

a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.   Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

d.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

## SUBSTANTIVE ALLEGATIONS

23.     Star Scientific produces a range of products to assist in maintaining a healthy lifestyle.   Through a subsidiary called Rock Creek, the Company produces "nutraceutical" dietary supplements.   The two most popular of these are Anatabloc and CigRx, an anti-

6

inflammatory and a tobacco alternative, respectively. Since approximately September 2012, Rock Creek has been selling an Anatabloc face cream designed to improve the appearance of the skin due to its anti-inflammatory properties. The primary active ingredient in Anatabloc is anataine, an alkaloid present in tobacco. The Company is extraordinarily reliant on sales of Anatabloc.

24.     On November 4, 2009, the Company filed its Definitive Proxy Statement on Schedule 14A with the SEC in anticipation of the annual meeting of shareholders. Among other things, the Proxy disclosed certain related party transactions, including:

> Additionally, on March 14, 2008, Mr. Williams executed a letter agreement under which he committed to make available to our company up to $2.0 million. The agreement ran through March 31, 2009, or until we received an additional $2.0 million in capital through an equity investment. On May 12, 2008, we entered into Securities Purchase Agreements pursuant to which we received proceeds of $4.0 million in return for the sale of 2,469,135 shares of stock and warrants for an equal number of shares. As a result of this transaction, Mr. Williams' March 14, 2008 letter agreement terminated.

25.     On November 9, 2010, the Company filed its Definitive Proxy Statement on Schedule 14A with the SEC in anticipation of the annual meeting of shareholders. Among other things, the Proxy disclosed certain related party transactions, including:

> On March 9, 2009 Mr. Williams purchased 2,371,541 shares of our common stock at a price of $1.14 per share and, for a price of $0.125 per share, purchased a warrant for an equal number of warrant shares at an exercise price of $1.50 per share. In accordance with our company's related party transaction policy, Mr. Williams' intention to  purchase shares and warrant shares of our company's stock was considered by the Audit Committee at a meeting held on March 9, 2010 and was approved by the Audit Committee and the Board of Directors on that date.

> On March 15, 2010, Rock Creek entered into a consulting agreement with Neil L. Chayet, Esquire, under which Mr. Chayet will assist Rock Creek in the recruitment and recommendation of members to be appointed to a Scientific Advisor Board of our company and in communicating to the public health community and others information regarding Rock Creek's products and mission. The agreement runs for a period of one year from March 15, 2010 to March 15,

2011, is terminable by either party without cause on fifteen days written notice and may be extended thereafter at our company's discretion for one month periods. Under the agreement, Mr. Chayet will be acting as an independent contractor and will receive a consulting fee of $6,000 per month and reimbursement for reasonable business expenses. Given Mr. Chayet's status as a Director of our company, the consideration of the consulting agreement and its potential impact on Mr. Chayet's status as an Independent Director was considered by our company's Audit Committee as a related party transaction in accordance with our company's related party transaction policy. At a meeting held on March 9, 2010, the Audit Committee approved the consulting agreement and recommended approval to the Board of Directors. The agreement was thereafter approved by the Board on March 15, 2010.

26.    On November 8, 2011, the Company filed its Definitive Proxy Statement on Schedule 14A with the SEC in anticipation of the annual meeting of shareholders. Among other things, the Proxy disclosed certain related party transactions, including:

On March 9, 2010 Mr. Williams purchased 2,371,541 shares of our common stock at a price of $1.14 per share and, for a price of $0.125 per share, purchased a warrant for an equal number of warrant shares at an exercise price of $1.50 per share and on November 5, 2010 Mr. Williams purchased 717,220 shares of our common stock at a price of $1.80 per share and, for a price of $0.125 per share, purchased a warrant for an equal number of warrant shares at an exercise price of $1.80 per share. On November 5, 2010 Messrs. Chayet, Haynes and Perito purchased 2,000, 10,000 and 50,000 shares respectively of our common stock at a price of $1.80 per share and, for a price of $0.125 per share, purchased a warrant for an equal number of warrant shares at an exercise price of $1.80 per share In accordance with our company's related party transaction policy, Mr. Williams' intention to purchase shares and warrant shares of our company's stock was considered by the Audit Committee at meetings held on March 9, 2010 and November 5, 2010 respectively and was approved by the Audit Committee and the Board of Directors on those dates. The purchase of shares by Messrs. Chayet, Haynes and Perito also was approved by the Audit Committee at the meeting held on November 5, 2010.

On March 4, 2011 Mr. Williams purchased 508,905 shares of our common stock at a price of $1.84 per share and, for a price of $0.125 per share, purchased a warrant for an equal number of warrant shares at an exercise price of $2.00 per share. In accordance with our company's related party transaction policy, Mr. Williams' intention to purchase shares and warrant exercisable into shares of our common stock was considered and approved by the Audit Committee of our Board of Directors on March 4, 2011. On March 15, 2010, Rock Creek entered into a consulting agreement with Neil L. Chayet, Esquire, for Mr. Chayet to assist Rock Creek in the recruitment and recommendation of members to be appointed

to a Scientific Advisor Board of our company and in communicating to the public health community and others information regarding Rock Creek's products and mission. The agreement was for a period of one year from March 15, 2010, was terminable by either party without cause on fifteen days written notice and could be extended thereafter at our company's discretion for one month periods. Under the agreement, Mr. Chayet acted as an independent contractor and received a consulting fee of $6,000 per month and reimbursement for reasonable business expenses. Given Mr. Chayet's status as a Director of our company, the consideration of the consulting agreement and its potential impact on Mr. Chayet's status as an Independent Director was considered by our company's Audit Committee as a related party transaction in accordance with our company's related party transaction policy. At a meeting held on March 9, 2010, the Audit Committee approved the consulting agreement and recommended approval to the Board of Directors. The agreement was thereafter approved by the Board on March 15, 2010. This agreement was not extended at the end of its one-year term and expired as of March 15, 2011.

27.     On March 15, 2012, the Company filed its Form 10-K for the year ended

December 31, 2011 with the SEC.  The 10-K was signed by defendants Williams, Perito,

Chapman, Chayet, and Haynes.  Among other things, the 10-K disclosed:

In 2011 and 2012 our Rock Creek subsidiary, the Roskamp Institute and researchers at John Hopkins University [sic], completed and reported on a number of studies designed to assess the ability of our anatabine citrate compound to lower chronic inflammation in a variety of pre-clinical and clinical settings. One study conducted by the Roskamp Institute and reported in the Journal of European Pharmacology showed that anatabine citrate lowered levels of a precursor protein associated with amyloid production both in the test tube and when administered to mice vulnerable to accumulation of amyloid which, at excessive levels, damages brain tissue. Also, researchers from *Johns Hopkins* presented a poster at the annual meeting of the American Thyroid Association. The reported research showed the positive effect of anatabine citrate supplementation in decreasing the incidence and severity of thyroiditis in animal models of the human disease. In February 2012, Rock Creek reported research on the first clinical trial demonstrating that Anatabloc® lowers chronic inflammation measured by CRP levels in the blood. The reported results were obtained in connection with an in-house study undertaken by Rock Creek that involves a group of smokers who have been using Anatabloc® on an extended basis.

In February 2012, Rock Creek initiated an in-house multi-site clinical trial to study the impact of an Anatabloc® formulation on thyroid health. The Roskamp Institute currently is conducting a clinical trial that began in mid-2010 and is designed to measure the impact of an Anatabloc® formulation on levels of CRP in non-smokers. The Roskamp Institute also is conducting pharmacokinetics and

dose response studies relating to anatabine citrate and Harvard University's McLean Hospital is completing follow-up research relating to its initial assessment of the abuse potential for anatabine as an alkaloid of tobacco. In 2009 and 2010 our company completed initial research relating to anatabine citrate in connection with the development of our CigRx® dietary supplement.

(Emphasis added).

28.     In addition to the March 2012 Form 10-K, at some time during the beginning of 2012, representatives of Star Scientific began telling investors that Johns Hopkins was involved in the purported clinical testing of Anatabloc. For example, on May 14, 2012, a financial blogger named Dr. John L. Faessel ("Faessel"), who authors an internet stock report called "On the Market," posted a column on *SeekingAlpha.com* reporting from a meeting at the Harvard Club held by Star Scientific for approximately 125 of its investors. The column stated in part:

> [Defendant Williams] held a "question and answer" session in which he and Dr. Mullan fielded a variety of questions. Williams obviously didn't want to talk about the "Anatabloc™ skin cream," but he mentioned that Johns Hopkins Medicine has nine studies now underway testing Anatabloc and said that several of the ongoing studies would finish up this summer. He likened Anatabloc to a ferry boat, as opposed to a cruise ship, meaning that the cruise ship will be the eventual prescription drug that is derived from the isomer of anatabine while the ferry boat represents the Anatabloc product now already available. "So why wait for the cruise ship that's in construction?" he suggested. Other questions related to thyroid and the multiple Johns Hopkins studies. Williams talked about how his wife is cured of thyroid disease; let us recall that the distinguished Johns Hopkins professor, Dr. Paul Ladenson, has stated that, "aside from RCP-006 (now Anatabloc) there is no known compound that stops thyroiditis."

29.     On June 27, 2012, the Company issued a press release concerning a clinical trial of Anatabloc. The press release stated in relevant part:

> GLEN ALLEN, Va., June 27, 2012 /PRNewswire/ -- Star Scientific, Inc. (NASDAQ: CIGX) announced today that the results of a successful animal study supporting the potential thyroid benefit of nutritional supplementation with Rock Creek Pharmaceuticals' anatabine supplement, Anatabloc®, were presented on Tuesday, June 26, in Houston, Texas, at ENDO 2012, the annual international meeting of the Endocrine Society.

The independently funded research team at **Johns Hopkins** conducted and completed a study of anatabine nutritional supplementation in a mouse model of autoimmune thyroiditis, entitled "Anatabine, a Tobacco Alkaloid, Reduces Disease Incidence and Severity in a Mouse Model of Autoimmune Thyroiditis."

Studies performed in the immunopathology laboratory of Dr. Patrizio Caturegli utilized female mice, placing half of them on dietary supplementation (drinking water) with anatabine, and the other half on plain water. All mice were injected with mouse thyroglobulin in Freund's adjuvant, a procedure that reliably induces autoimmune thyroiditis with histopathological features and thyroid gland dysfunction similar to Hashimoto's thyroiditis in humans.

Anatabine dietary supplementation significantly reduced the incidence and severity of experimental autoimmune thyroiditis. Thirty-one of thirty-two control mice developed thyroiditis (97%), as compared with twenty-one of twenty-nine (72%) anatabine treated mice ($P<0.007$). More importantly, the anatabine treated mice that did develop thyroiditis had lower histopathological severity of inflammation, lower anti-thyroid antibody levels early in their disease, and lesser declines in serum thyroxine.

The results of the full study, which was preliminarily reported in a poster presentation last fall at the Annual Meeting of the American Thyroid Association, led Dr. Paul W. Ladenson, Director of Endocrinology and Metabolism at **Johns Hopkins**, to comment, "Our finding that anatabine reduces the incidence and severity of autoimmune thyroiditis in this mouse model justifies human studies of whether this nutritional supplement may be effective in preserving thyroid health in people with Hashimoto's thyroiditis. Consequently, a human trial to test this hypothesis (the ASAP Thyroid Study) was designed and is now being carried out."

Dr. Curtis Wright, Senior Vice President and Medical/Clinical Director of Star Scientific's wholly owned subsidiary Rock Creek Pharmaceuticals Inc., stated, "We started our research with the simple goal of developing a useful nutritional supplement. The possibility, now supported by external research findings that one of our products could help maintain thyroid health, is very exciting to us, and is ample reward for the efforts of Rock Creek's research team in designing and conducting the ASAP Thyroid Study with the oversight assistance of an independent scientific committee. The current impressive results achieved by the Johns Hopkins team strongly support the first look at the thyroid data in man, which we anticipate will be available in the third quarter."

(Emphasis added).

30.    On August 1, 2012, a research analyst for Gilford Securities named, Otis Bradley

reported:

One example of Star's near-term potential: We believe it possible that a release of a Johns Hopkins University School of Medicine report describing positive test results from humans for treatment of thyroid diseases using Star's Anatabine technology could cause sales of Star's Anatabloc anti-inflammatory tablet (now on the market over-the-counter) to skyrocket from virtually nothing today to an annual run-rate over $400 million (with profit of $200 million or $1.00 per share) in 2013. (See "2013 Estimates" page 6.) Test results from Hopkins are expected to be released this third (September) quarter. We hope August.

\* \* \*

In the normal course of business, Gilford Securities seeks to perform investment banking and other services for various companies and to receive compensation in connection with such services. As such, Gilford Securities intends to seek compensation for investment banking services from the subject company in the next three months.

31.     On October 9, 2012, Faessel published another column titled, "Star Scientific (STSI) – The Tipping Point Draws Near," stating in part:

Very soon, IMHO, the Star Scientific landscape will change dramatically as Johns Hopkins is about to release their nine city study on the effects of Anatabine / Anatabloc on thyroid disease. Un-blinding, compilation and analysis of their study results are likely near or already finished by their contract research organization [CRO] prior to Johns Hopkins receiving and publishing the results.

There is much riding on these scientific findings as naysayers (shorts) and the true believers (that would include me) are so dramatically on the different sides of the 'story' that's tied to the beneficial effects of Anatabine / Anatabloc. The naysayers / shorts have continually increased their mega million $ bet saying the compound doesn't work - or it's a scam - or the inventory levels are increasing or the company needs more money or the CEO wears a black hat and rides a black horse or whatever. Interestingly, they never question the results of the Johns Hopkins or Roskamp science but they are all-over the balance sheet and peripheral issues.

\* \* \*

To date the results off the Roskamp Institute, Johns Hopkins research has been nothing but exemplary. Comprehensive international patents have also been published telling of the myriad of conditions where the Anatabine / Anatabloc compound is deemed to be effective.

Recent Roskamp and Johns Hopkins research funded in part by the Walton Family Foundation confirms that anatabine / (Stars) Anatabloc™: 1. is anti-inflammatory. 2. Lowers C-reactive Protein [CRP] levels in an Alzheimer's model

in mice. 3. Inhibits NF-kB activation. NF-kB is the master regulator of inflammatory molecules such as cox-2. In January Star announced that it had completed a successful human clinical trial showing that Anatabloc™ lowers chronic inflammation as measured by C-reactive protein [CRP] levels in human subjects' blood.

\* \* \*

So we await the John's Hopkins [sic] results. Buts let's first review a centerpiece quote by Dr. Paul Ladenson, Director of the Division of Endocrinology at Johns Hopkins in June 2011 when he stated that, "aside from RCP-006 (anatabine - now Star's Anatabloc™) there is no known compound that stops thyroiditis."

By my reckoning Johns Hopkins has been specifically investigating anatabine's /now Anatabloc's ™ effects for about 4 years. Going back further to 2004 Dr. Ladenson and Johns Hopkins conducted studies among a group of flight attendants and found reduction of thyroiditis / Hashimoto's disease related to inhalation of second hand cigarette smoke. Dr. Ladenson has addressed several thyroid disease related conferences referencing Johns Hopkins work on the subject, usually in a keynote address at the conference. Just last month (9/21/2012) Dr. Ladenson was awarded the Lewis E. Braverman Award at the 82nd American Thyroid Association's [ATA] Annual Meeting in Québec City, Québec, Canada. In the press release announcing the award it mentioned that, "Currently, Dr. Ladenson is investigating effects of the nutritional supplement anatabine on autoimmune Thyroiditis." More below on Dr. Ladenson and the Conference.

So Johns Hopkins has been interested in the science for a number of years and has done a lot of work on it to put it mildly...

32. On January 23, 2013, *TheStreet.com* published an article titled "Star Scientific's Made-Up, Misleading Relationship with Johns Hopkins," reporting in part:

GLEN ALLEN, Va. (TheStreet) -- Manti Te'o isn't alone in concocting imaginary relationships. So, too, is Star Scientific (STSI), which has misled investors about the involvement of Johns Hopkins University in the clinical testing of the company's retail nutritional supplement anatabine.

Star Scientific and its Internet stock promoters want investors to believe that Johns Hopkins has been actively involved with, and even supportive of, anatabine's clinical development. The benefit to Star Scientific is obvious: Johns Hopkins is well-known and respected, so the school's academic imprimatur lends scientific credibility to anatabine.

Except Johns Hopkins has no official involvement with Star Scientific or

anatabine. That includes Star's subsidiary Rock Creek Pharmaceuticals, according to a Johns Hopkins School of Medicine spokesperson.

Star Scientific paid Ladenson for his consulting work, which apparently includes offering this assessment of the anatabine thyroid study:

*Data from this rigorously conducted, placebo-controlled, double blind trial show that anatabine-treated subjects had progressive decreases in circulating thyroglobulin antibody levels, which became significant by the end of the trial. Current treatment for autoimmune thyroiditis is limited to end-stage disease when irreversible gland damage necessitates lifelong thyroid hormone replacement. The prospect of a novel nutritional or pharmaceutical intervention that could preserve thyroid health represents an encouraging advance. Further clinical studies are now warranted.*

***Asked to comment on whether Johns Hopkins, as Ladenson's employer, approved his anatabine statement, Desmon responded:***

***"We do have guidelines about such things and he [Ladenson] is in violation here." Johns Hopkins has started an inquiry into the matter, Desmon added.***

Johns Hopkins would not make Ladenson available to comment. Star Scientific did not respond to an email requesting comment.

***Dr. Patrizio Caturegli, also a professor at Johns Hopkins Medical School and a paid consultant to Star Scientific, co-authored a paper last year with Ladenson in which mice were treated with anatabine. Star Scientific publicizes the findings of Caturegli's paper without disclosing the company's financial relationship with the authors.***

As it stands, there is no science backing Star's claims that anatabine reduces inflammation, relieves pain or treats Alzheimer's, thyroid disease, multiple sclerosis, traumatic brain injury or other auto-immune diseases [These are all medical claims Star makes or insinuates with its constant anatabine promotions.]

Anatabine is not FDA approved for anything, but thanks to lax rules and generous loopholes, Star is able to sell the nutritional supplement over the Internet and at GNC retail outlets. What Star hasn't been able to do is convince people to buy anatabine. Sales are minimal, totaling just $1.7 million in the last reported quarter.

Which is where the Johns Hopkins connection comes into play. Star wants investors and the general public to believe anatabine is a drug capable of curing all sorts of diseases. The marketing message is simple: If Johns Hopkins believes in anatabine, you should too.

Internet stock promoter Dr. John Faessel (he's a dentist) embraces Star's misleading marketing message and runs with it. In two columns posted recently on Seeking Alpha -- both bullish on Star Scientific -- Faessel refers repeatedly to the "successful Rock Creek/Johns Hopkins human trials of anatabine."

Wrong. Johns Hopkins had no involvement in the anatabine trial.

Gilford Securities analyst Otis Bradley also plays along with the deception. In a recent research note, Bradley writes, "The [anatabine] thyroid research has been done by the John Hopkins University School of Medicine, certainly one of the most preeminent medical institutions in the world, under the lead of Paul Ladenson, chief endocrinologist and one of the preeminent leaders in the world in his profession."

Wrong again. Star Scientific is solely in charge of the anatabine thyroid study, which recruited patients from nine private U.S. clinics, none with academic credentials. Ladenson may be an expert on thyroid disease but he's being paid by Star Scientific.

Star Scientific also pays golfer Fred Couples to endorse anatabine. At this point, there's very little to distinguish Couple's advertising pitch and Ladenson's consulting work.

(Emphasis added).

33.     On January 28, 2013, Star Scientific took the unusual step of publicly refuting the

contents of the January 23 *TheStreet.com* article. The press release stated in part:

GLEN ALLEN, Va., Jan. 28, 2013 /PRNewswire/ -- Star Scientific, Inc. (STSI) commented today on a January 23, 2013, column appearing on TheStreet.com. That piece contains numerous false and misleading statements regarding the Company's anatabine research and the initial results of the ASAP Human Thyroid Health Study released by Star Scientific on January 7, 2013.

\* \* \*

The ASAP study, which examines the impact of anatabine dietary supplementation on thyroid health, was conducted by Rock Creek Pharmaceuticals, the Company's subsidiary. The study was not sponsored by the Johns Hopkins School of Medicine, and the Company never reported otherwise. Indeed, when Star Scientific first announced IRB approval of this study on February 9, 2012, it noted that the study was being conducted by Rock Creek Pharmaceuticals at sites in Texas, Illinois, and Florida. The Company also consistently referenced that this study was being conducted by Rock Creek Pharmaceuticals at multiple sites in subsequent press releases, including the

January 7, 2013, release.   Any implication by the author of the article in TheStreet.com that Star Scientific stated otherwise is patently false.

* * *

Furthermore, The Street.com article's implication or suggestion that Johns Hopkins has had no involvement in anatabine research is also false.   As previously reported, a preclinical investigator-initiated and independently funded study from Johns Hopkins examined the effect of anatabine supplementation on autoimmune thyroiditis in a mouse model and that research was recently published in an article entitled, "Anatabine Ameliorates Experimental Autoimmune Thyroiditis" in the Endocrine Society's journal, Endocrinology. (Endocrinology. 2012 Sep; 153(9):4580-7.)   All three of the published articles referenced in this press release were peer reviewed anonymously by experts in the field chosen by the editors of the journals.

Star Scientific notes that the author of the article in TheStreet.com, Adam Feuerstein, has published a number of negative articles regarding the Company and its research on anatabine.   The Company believes that investors and consumers of its Anatabloc® product would be well advised to view any such articles by this author or publications regarding the Company in TheStreet.com with substantial skepticism, given the misstatements and misinformation that the author disseminates.

34.   On January 29, 2013, the author of the original article on *TheStreet.com*, Adam Feuerstein, responded with an article titled, "Refuting Star Scientific's Refutation," reporting in part:

BOSTON (TheStreet) -- Star Scientific (STSI) confirmed Monday that Johns Hopkins Medical School has no ongoing relationship or involvement with anatabine and the human thyroiditis study. Star graciously confirmed my reporting from last week.

I'm happy to see Star come clean on the controversy. For its next step, the company should write a letter (or three) to Internet stock promoters Dr. John Faessel, Patrick Cox and Gilford Securities analyst Otis Bradley. All three men continue to mislead their followers and clients about the non-existent Star-Johns Hopkins relationship. Or, is Star only perturbed when someone writes critically about anatabine?

And while Star is coming clean, let's clear up the ongoing confusion regarding Dr. Paul Ladenson and his involvement in the anatabine thyroiditis trial. We know Johns Hopkins didn't participate so what role did Ladenson play, exactly? How much is Star paying him to consult? Who wrote Ladenson's statement describing

the anatabine study that was included in Star's Jan. 7 press release? If Ladenson actually spoke those words, did he knowingly violate Johns Hopkins academic guidelines? Or, did Star attribute its own conclusions about the study to Ladenson without his permission?

35.     On March 18, 2013, the Company filed its Form 10-K for the 2012 fiscal year with the SEC. The 10-K was signed by defendants Williams, Perito, Chapman, Chayet, Haynes, and Everett. Among other things, the 10-K disclosed that it has sustained operating losses for *ten* consecutive fiscal years, and that for the year ended December 31, 2012, the Company's operating loss was $22.9 million. The 10-K also belatedly disclosed that approximately two months earlier, the Company had received a subpoena from the DOJ:

> Our revenues are currently dependent almost exclusively on sales of our dietary supplement products (in particular, Anatabloc®).
>
> For 2012, virtually all our dietary supplement revenues were derived from sales of our Anatabloc® dietary supplement. Our inability to increase our sales of Anatabloc® or any significant decline in sales for Anatabloc® from current levels (including for any of the reasons discussed in this "Item 1A. Risk Factors") could have a material adverse effect on our results of operations, financial condition and cash flows.
>
> * * *
>
> We are responding to subpoenas in a government investigation.
>
> In late January and February of this year, our company, directors and others received subpoenas from the United States Attorney's Office for the Eastern District of Virginia seeking documents. Our present understanding is that the investigation is principally focused on transactions involving our company's securities including certain private placements and related party transactions since 2006. We are responding to the subpoenas and intend to cooperate fully with the investigation. In addition, we engaged outside counsel (the international law firm of Chadbourne & Parke, LLP) to conduct an internal investigation of these matters.
>
> We are unable to predict the duration of the internal investigation or the United States Attorney's investigation. No conclusion can be drawn at this time as to outcome, or whether these matters will result in any materially adverse impact on our company. While the investigation is pending, we intend to remain focused on our core business activities, including expanding sales of our Anatabloc® product

17

and continuing clinical and related research on our current development schedule. We do not intend, and disclaim any obligation, to provide continuing or updated disclosure regarding these requests and inquiries absent definitive developments unless otherwise required by law.

36.   On March 26, 2013, the Company issued a press release stating:

GLEN ALLEN, Va., March 26, 2013 /PRNewswire/ -- Paul L. Perito, Esquire, Chairman, President, and COO of Star Scientific, Inc. (STSI), issued the following statement on behalf of Star Scientific and Rock Creek Pharmaceuticals, Inc.:

This morning, Star Scientific was alerted to the filing of a purported class action lawsuit against the Company in the U.S. District Court for the Eastern District of Virginia (Richmond Division). The complaint, which lists one named plaintiff, focuses on the validity of the Company's research and development related to the active ingredient in the Company's now marketed dietary supplements and cosmetic products. Star Scientific is proud of its worthy science-based products, as well as the fact that these products are used by thousands of satisfied regular customers. We stand behind our scientific research, and that of other credentialed third-parties, that has been conducted on our anatabine compound as well as the reporting on the results of that research. Accordingly, the Company will vigorously contest each of the allegations in the complaint. We are confident that the meritless nature of this lawsuit will cause it to be ultimately dismissed.

In a cursory review of the complaint, the Company noted, with interest, that the purported lead class action plaintiff is an individual who purchased 500 shares of Star Scientific stock on January 23, 2013, and held the stock for only seven days, selling his 500 shares on January 30, 2013. For a range of compelling reasons, it is difficult to conceive of a more inappropriate class action plaintiff representative. In addition, the lawsuit seems to result from a wide, and until now, unsuccessful search by plaintiffs' law firms seeking to find anyone to bring any kind of action without regard to its merits.

## DAMAGES TO THE COMPANY

37.   Star Scientific has been, and will continue to be, severely damaged and injured by the Director Defendants' misconduct. As a direct and proximate result of the Director Defendants' conduct, Star Scientific has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a.   costs incurred in compensation and benefits paid to defendants that breached

their duties to the Company;

b.  substantial loss of market capital;

c.  costs already incurred defending against the pending securities class actions, and potential liability therefrom; and

d.  costs incurred responding to the DOJ subpoena, retaining outside counsel in connection with same, and potential liability related thereto; and

e.  any fines that are a result of the Company's violations of the federal securities laws.

38.    In addition, Star Scientific's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company has still not fully admitted nature of Johns Hopkins' purported involvement in the Anatabloc trials.  The credibility and motives of management are now in serious doubt.

39.    The actions complained of herein have irreparably damaged Star Scientific's corporate image and goodwill.  For at least the foreseeable future, Star Scientific will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Star Scientific's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

40.    A pre-suit demand on the Star Scientific Board is futile, and therefore, excused. This is because despite knowing that the Company's revenue was almost entirely reliant on sales of Anatabloc, and knowing that a lack of controls over disclosure would cause the Company substantial harm, the Director Defendants breached their fiduciary duties by permitting Star Scientific to disseminate inaccurate information related to the clinical support for its assertions

about the effectiveness of Anatabloc and its active ingredient. Indeed, the misleading relationship with Johns Hopkins was set forth in public filings signed by the Director Defendants. The Board has also approved a number of related party transactions involving Company stock dating back to 2006 that are now being investigated by the DOJ. Not only has the Board permitted improper related party transactions, but also breached its duty of candor by waiting a full two months to disclose that it had received a subpoena. In so doing, the Director Defendants exposed the Company to severe damage and injury. Consequently, the Director Defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore excused.

41. The current Board of Star Scientific consists of the following six individuals: Williams, Perito, Chapman, Chayet, Everett, and Haynes. These defendants have failed to exercise reasonably appropriate oversight over the internal controls for related party transactions and disclosure.

42. Defendant Williams is primarily employed as CEO of Star Scientific. As such, he derives significant income from his employment at the Company and his professional reputation is inextricably bound to his role at Star Scientific. For a CEO of a company with a market capitalization of less than $300 million that has operated at a loss for the past ten years, Williams received an astonishingly high level of total compensation in 2011: $9,089,004 for the year. Williams, if not the source of certain untrue and misleading statements made about the role of Johns Hopkins, was certainly aware of these representations. Moreover, upon information and belief, Williams was a participant in certain related party stock transactions that are the subject of the DOJ subpoena. This is not the first time that Williams has been the target of government

20

legal action: in 1994, a judgment was entered against Williams in *SEC v. Williams*, 93.cv-12789-JLT (D. Mass 1993) (Dkt. No. 8) (Tauro, J.), an action alleging that Williams was fraudulently paid by officers of a company to promote stock while the offers sold their own stock. The SEC obtained a permanent injunction against Williams and he was forced to disgorge $294,844 of ill-gotten gains. As evidenced by the foregoing and the fact that the Company has continued to defend the statements about Johns Hopkins, defendant Williams has failed to take effective action to institute functioning controls over the Company that he is charged with running. Due to defendant Williams' complicity in the wrongdoing alleged herein and failure to institute functioning controls in the face of obvious risks, Star Scientific has been seriously damaged. As result, demand on defendant Williams is futile.

43. Defendant Perito is the interim Chairman of the Board, COO, and President of the Company. As detailed herein, defendant Perito was the source of the Company's statement characterizing shareholder allegations of securities fraud as meritless, personally attacked the named plaintiff, and dismissed the shareholder concerns as lawyer-driven. Moreover, defendant Perito earns an incredibly high amount of compensation for a non-CEO executive at a small cap Company which has operated at a loss for ten consecutive years: in 2011 defendant Perito received total compensation of $7,727,985. Due to defendant Perito's complicity in the wrongdoing alleged herein and failure to institute functioning controls in the face of obvious risks, Star Scientific has been seriously damaged. As result, demand on defendant Perito is futile.

44. Defendant Chayet is purported to be an independent member of the Board. However, from March 2010 through March 2011, Chayet worked as a consultant for Rock Creek. Defendant Chayet's role at Rock Creek was to recruit and recommend members for

21

appointment to the Scientific Advisor Board of Star Scientific and to aid in communicating to the public health community and others regarding Rock Creek's products and mission. For his services to Rock Creek, defendant Chayet was compensated $6,000 per month plus expenses. In his role as a consultant for Rock Creek, Chayet was responsible for the precise subject matter that would have included disclosures related to Johns Hopkins' purported role in clinical trials of Anatabloc. Thus, defendant Chayet not only was directly involved in much of the wrongful conduct complained of herein, but contrary to the Company's public representations, he is not an independent director. As a result, defendant Chayet is not independent and disinterested and any demand upon him would be futile.

45.     Upon information and belief, defendants Haynes and Chapman are members of the Audit Committee.[1] The Audit Committee of the Board, according to the Company's public filings, is responsible for oversight relating to: (i) the Company's controls over disclosure; and (ii) approval of related party transactions. Haynes and Chapman were both members of the Audit Committee during the period that the misleading disclosures regarding Johns Hopkins were made. Chapman has been a member of the Committee since 2006 and Haynes has served as Chair of the Audit Committee since some time in 2010. During the entire period for which the DOJ subpoenaed related party transaction information, Chapman has served on the very committee charged with approving such transactions. Likewise, the DOJ subpoena encompasses the Haynes' entire tenure as Chair of the Audit Committee. Thus, both Chapman and Haynes are directly responsible for the failure of oversight alleged herein. As detailed above, the Audit

---

[1]     The Company's website does not include a list of current director committee assignments or the charters of Board committees for investor inspection. According to the Company's most recent proxy statement, the Audit Committee was formerly composed of defendants Haynes and Chapman, as well as a third director who no longer serves on the Board. The proxy also states that in most situations the Audit Committee is required to be comprised of three independent directors. However, in no SEC filing or press release has the Company disclosed the appointment of a new third member to the Audit Committee.

Committee failed to institute sufficient processes for managing the business and financial risks created by the failure to institute functioning controls over disclosure, and, for a period spanning nearly seven years, approved improper related party transactions. Defendants Haynes and Chapman breached their duties by failing to sufficiently monitor the Company's business and financial risks and by approving improper, and potentially illegal related party transactions. As a result of these defendants' breach of their duties, any demand upon them is futile.

46. Upon information and belief, the Compensation Committee is currently comprised of defendants Chapman, Chayet, and Haynes. According to its charter, among other things, the Compensation Committee of the Board is responsible for recommending to the Board, salaries, bonuses, and other forms of compensation for the Company's executive officers, including stock options, restricted shares, and other forms of equity compensation. As such, the Compensation Committee members, defendants Chapman, Chayet, and Haynes, are responsible for the excessive salaries paid to defendants Williams and Perito of over $9 million and $7 million, respectively. Star Scientific has operated at a loss since 2003, and is a relatively small Company at under $300 million in market capitalization. On December 27, 2010, Company stock closed at $1.95 per share; during 2010, defendants Williams and Perito received total compensation of $3.9 million and $4.1 million, respectively. On December 29, 2011, Company stock closed at $2.23 per share, yet during 2011, Defendants Williams and Perito received total compensation of $9.1 million and $7.7 million, respectively. The level of compensation paid to defendants Williams and Perito demonstrates that the members of the Compensation Committee are under the domination of Williams and Perito whose interests they have put before the interests of the Company's unaffiliated shareholders. By their actions as members of the Compensation Committee, defendants Chapman, Chayet, and Haynes are unable to consider a

demand against their fellow directors in a disinterested and independent fashion. Thus, demand is excused as to the members of the Compensation Committee.

47.     The Director Defendants have failed to take action against those who are responsible for permitting Star Scientific to function without effective internal controls. No action, legal or otherwise, has been taken against any current or former director or officer in connection with the misleading Johns Hopkins disclosures or the improper approval of related party transactions. In 2012, a director named Mario V. Mirabelli who had been a member of the Audit Committee stepped down, but the Company stated that his departure was for personal reasons. Defendants Chapman and Haynes, who breached their duties in their capacities as Audit Committee members, continue to serve on the Audit Committee. Defendant Williams, who, upon information and belief, was involved in the improper related party transactions, continues to dominate the Board. Thus, the Director Defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein. Moreover, the Director Defendants have thus far attempted to deny that the Company made misleading statements regarding Johns Hopkins' purported participation in clinical trials, and have even taken the unusual step of directly attacking shareholders who stepped forward to defend their rights under the Securities Act. Thus, demand on the Board is futile and therefore excused because the Director Defendants have not only demonstrated their hostility to the allegations herein through their inaction, but also through their own words.

48.     The Director Defendants' decision to approve improper related parties transactions and deprive Star Scientific of legally sufficient internal controls to assess same has

24

resulted in the likelihood of legal action as a result of the DOJ subpoenas. The Company has disclosed that the DOJ is reviewing transactions as far back as 2006. There has been no assurance made that this problem is not more extensive than initially disclosed. The wrongdoing alleged herein is not the product of a rogue employee or a group of such employees, but of the Board itself. A majority of the current Board has served together for the entire period under investigation by the DOJ: defendants Williams, Perito, Chapman, and Chayet have all been directors since prior to 2006. Thus, these directors actively participated in the wrongdoing alleged herein. Demand on the entire Board is futile and therefore excused.

49.    As particularized herein, to properly prosecute this lawsuit, the Director Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they have refused to do thus far, and there is no reasonable basis to believe they will do so in the future. A majority of the Director Defendants are exposed to potential liability for operating Star Scientific without the internal controls that would have detected and prevented the improper related party transactions and misleading and belated disclosures detailed herein. Thus, demand on the Director Defendants is futile, and therefore, excused.

50.    The Director Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the substantial financial benefit derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Likewise, these defendants have received, and will continue to receive, substantial remuneration predicated upon their service on Star Scientific's Board. The acts complained of herein have resulted in substantial economic benefits to the Director Defendants without corresponding recognition of,

or accounting for, the correlated liability and risk that Star Scientific was subject to as a result of its lack of internal controls. The Director Defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation. Thus, demand on the Director Defendants is futile, and therefore, excused.

51. The Star Scientific Board is dominated by directors that are specifically implicated in the wrongdoing alleged herein. Five of the six directors are either: (a) an officer; (b) a member of the audit committee; and/or (c) a director on the Board for the entire period being investigated by the DOJ. As a result, the Board is dominated by persons who are specifically implicated in the wrongdoing and therefore cannot be expected to sue themselves.

52. Star Scientific's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of Star Scientific. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Star Scientific against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Star Scientific, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I

### Breach of Fiduciary Duty

53.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

54.     Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Star Scientific's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

55.     Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Star Scientific.

56.     In breach of their fiduciary duties owed to Star Scientific, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Star Scientific's business, rendering them personally liable to the Company for breaching their fiduciary duties.

57.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, Star Scientific has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Abuse of Control

58.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

59.     Defendants' misconduct alleged herein constituted an abuse of their ability to

control and influence Star Scientific, for which they are legally responsible.

60.     As a direct and proximate result of defendants' abuse of control, Star Scientific has sustained significant damages.

61.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Star Scientific has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

62.     By reason of the foregoing, Star Scientific has been damaged.

**COUNT III**

**AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE**

**SECURITIES EXCHANGE ACT OF 1934**

63.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on November 14, 2012, and possibly all previous proxy statements since 2006, violated §14(a) and Rule 14a-9 because they included materially false and misleading financial statements.

65.     The Proxies were false and misleading when issued because they failed to disclose (among other things) that the Company's controls over accounting and financial

disclosure were deficient and contained financial statements that were false and misleading.

66.    In the exercise of reasonable care, defendants should have known that the statements contained in the Proxies were materially false and misleading.

67.    The misrepresentations and omissions in the proxy statements were material to Company shareholders in voting on the proxy statements.  The proxy statements were an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the improper accounting and the failure to institute sufficient controls over financial reporting.

96.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statements.

68.    By reason of the foregoing, Star Scientific has been damaged.


## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Star Scientific and that plaintiff is an adequate representative of the Company;

B.    Declaring that the Director Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Star Scientific;

C.    Determining and awarding to Star Scientific the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.    Directing Star Scientific and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect Star Scientific and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Star Scientific to nominate at least three candidates for election to the Board;

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.    Determining and awarding to Star Scientific exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.    Awarding Star Scientific restitution from defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R.Civ.P. 38(b), Plaintiff demands a trial by jury.

Dated: May 3, 2013

By: _____
DANIEL M. COHEN
(VA Bar No. 79836)
ROBERT J. CYNKAR
(VA Bar No. 23349)
Cuneo Gilbert & LaDuca, LLP
106-A South Columbus St.
Alexandria, VA 22314
(202) 789-3960

JOSHUA M. LIFSHITZ
LIFSHITZ LAW FIRM
18 East 41st Street
New York, NY 10017
(212) 213-6222

Attorneys for Plaintiff